## KETTERINGHAM v. NEW ENGLAND FIRE INS. CO. et al.

### Civ. A. No. 2191.

District Court, W. D. Louisiana, Opelousas Division.

April 7, 1948.

Atlee P. Steckler, of Ville Platte, La., and Joseph A. Loret, of Baton Rouge, La., for plaintiff.

W. C. Perrault, of Opelousas, La., and Arthur A. Moreno, of New Orleans, La., for defendants.

PORTERIE, District Judge.

The plaintiff sues the defendants, two insurance companies, on several policies of storm insurance issued by them to him. The suit is for losses for storm damage to a canning plant and to a lot of canned beans stored therein, resulting from a storm which occurred on the night of January 4-5, 1946. The suit was filed on June 6, 1947, more than one year after the loss.

The defendants have filed a plea of prescription, under a provision contained in the policies, La.Act No. 251 of 1944, reading as follows: "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the requirements of this policy shall have been complied with, and unless commenced within twelve months next after inception of the loss."

The defense of the plaintiff is in part represented by the following language of articles V and VI of his petition:

"V That your plaintiff, upon being apprised of the damage caused by the strong wind, rain and storm, immediately reported the damages to his insurers, and after investigation by representatives and agents

of said insurance companies, the defendants herein, were authorized to repair the damages caused to said wall and roof of said plant, and to make an estimate of the stock damage therein and thereto incurred and suffered by virtue thereof and to report same, so that the proper adjustments would be ultimately made.

"VI Plaintiff alleges further, that he complied with said instructions and made said reports as requested, and that agents and representatives of the defendant companies herein, appeared from time to time, discussing settlement and other details with reference thereto, continually leading your plaintiff to believe that full satisfaction would be rendered in paying the loss and damages suffered by your plaintiff, to his building and stock, as a result of said storm, rain and hard wind."

At the very beginning of the trial on this plea of prescription, the proponents of the plea moved, after placing in evidence the three storm policies involved, proving the date of the loss, and the date of the filing of the suit, for an immediate ruling by the court to sustain the plea.

█ It is incumbent upon us (and we did promise it anyway) to pass upon this first motion before considering anything else in the record of the case. The allegations of articles V and VI of the petition, of course, precede the plea of prescription. Since they have to be taken as proved for the purposes of this ruling, as well as all other allegations of fact properly pleaded in the petition which are relevant and material, we overrule the motion to sustain the plea of prescription at this juncture. The actions of the defendants are a waiver of the running of the time.

So, we now proceed to establish other facts. A number of losses, as a result of the same storm, were reported to these defendant companies by Mr. Louis Dupre, their local agent at Ville Platte, Louisana, the situs of the plaintiff's canning plant. Mr. R. M. Franklin, an insurance adjuster, representing the defendants, went to Ville Platte about ten days after the date of the storm and inspected plaintiff's plant, among others, accompanied by Mr. Dupre. The plaintiff was absent at the time, but the foreman in charge took the two agents to view the damage. It was immediately noted that the wire and glass skylights in the storage room of the building were broken; and though the canned beans were not stored directly under the broken skylights, but at some distance off, it was evident that the rain had fallen on the canned beans. These canned beans were stacked, all closely together, 15 tiers high, with 7 cases to the tier. The inspection lasted but for a half hour and the inspectors authorized the foreman to repair the broken plate glass.

Soon thereafter, plaintiff, after noticing that water had fallen on the cans, had his workmen go through the stock to dry it off; and on or about April 15, 1946, the insurance companies were notified by their local agent, Mr. Dupre, that about 500 cans of the beans were seriously damaged. Before a complete inspection by plaintiff of the damage to his stored beans, the United States government, which had previously contracted for the whole stock, ordered the plaintiff to ship the beans at once to the state of California.

So, sometime prior to April 29, 1946, the beans were shipped to California but were rejected shortly thereafter by the government on the ground that they were damaged.

The Franklin Adjustment Bureau, of which Mr. R. M. Franklin is a member, represented the defendants in their dealings with the plaintiff from the beginning to the end. Mr. Ketteringham, the plaintiff, himself did not see any representative of the defendant company until April 15, 1946. However, Mr. Ketteringham, being personally in California, notified the Franklin Adjustment Bureau, whose office is in New Orleans, Louisiana, immediately of the rejection by the government and Mr. Franklin, for the bureau, referred the matter, on April 29, 1946, to the Underwriters Salvage Co., operated by the insurance companies, for attention.

On May 6, 1946, the plaintiff wired the adjuster, as follows:

"Imperative I receive some information as to what is proposed by your organization to handle the bean situation as I must return home immediately. Any further

delay will result in additional losses. Wire me at Alexandria Hotel Los Angeles."

On May 7, 1946, the adjuster replied to that telegram, as follows:

"Your telegram. Company is not in a position either to admit or deny liability. You must act on your own responsibility."

On May 8, 1946, the plaintiff wired the adjuster, as follows:

"Navy rejected entire lot three cars merchandise Requests immediate removal merchandise Your Salvage Division must handle at once to segregate and recondition entire lot We feel this is your responsibility Must have immediate action We intend to leave for Ville Platte Thursday May 9th."

The adjuster replied on May 8, 1946, as follows:

"Your telegram You must act on your own responsibility as any liability on the part of interested companies is denied."

On the same day the plaintiff wired the adjuster, as follows:

"Retel you have already admitted damage **to** roof and this stock was under damaged roof so your companies alone responsible for all damage caused by storm as coverage includes storm damage. Investigation San Diego proves this a water damage You can save considerable loss by having Salvage Division handle otherwise will be forced to drastic action to recover full loss which will exceed thirty thousand dollars."

On the same day, May 8, 1946, the adjuster wrote a letter to the plaintiff reproducing the exchange of telegrams and further informing the plaintiff, as follows:

"Any salvage operations undertaken should be done so at the instance of the owner of the merchandise."

The plaintiff, being left apparently in a dilemma, did not lose his patience but expeditiously proceeded to minimize the damage through the Boradori Brokerage Co., of Los Angeles, California. This salvage company sold the shipment for $13,088.05. Though at one time, April 27, 1946, plaintiff filed a claim with the defendants' agents for $22,319.56, the claim in the present suit accordingly has been brought down to $12,-802.86. The energy and the diligence of this plaintiff meet with our commendation.

On May 22, 1946, Mr. Ketteringham and Mr. Franklin met at Lafayette, Louisiana, and stayed together for hours. There was an object in the two meeting at Lafayette, outside of the present suit,—the adjustment of another claim entirely different from this one and smaller in amount. Ketteringham, however, clearly and categorically stated that, in addition to the settlement of this smaller claim, Mr. Franklin, for his salvage company and therefore for the defendant companies, agreed to pay an amount of around $10,000.00, more or less, if Mr. Ketteringham could reduce his claim to around that amount. At the time of this Lafayette meeting of the two, the salvaging was going on in California.

On the other hand, Mr. Franklin just as clearly and categorically denied that any such understanding occurred, that any such promise was made by him, or that the instant case was even discussed. The issue on this plea of prescription, as we understand the applicable law which is to be discussed later, will be determined by our decision as to which one of these two gentlemen we believe.

We must quote Mr. Ketteringham, verbatim, several times; on direct-examination:

"Q. All right, did you have any dealings with Mr. Franklin about this case? A. Yes.

"Q. What did you say to him? A. Well, we had continuous dealings, and on May 22nd I met him in Lafayette.

"Q. Did you have any conversation with him in Lafayette on May 22nd, that is about these matters? A. Yes, not only at Lafayette, but at New Iberia, and later at Hill Top Club.

"Q. Where is Hill Top Club? A. Right out of Lafayette, and then at some place in Lafayette too.

"Q. At some place in Lafayette too? A. Yes, at a little club right across from the Gordon Hotel—I heard the name a while ago—Town House.

"Q. What were you doing at Town House? A. We went over there to take a few drinks.

"Q. Did you have any conversation in Lafayette with him? A. Yes, we did at Hill Top Club.

"Q. You say that at all three places you had a discussion with him about the matter involved in this suit? A. Yes, sir.

"Q. Tell us what the conversation was? A. Well, with regard to the discussion, we at first filed this claim for a considerable amount of money, and then after I got to negotiating with the adjuster, and we were led to believe—(Objection by counsel) * * * We were told at the time that if I would reduce this claim within an amount of about ten thousand dollars it would be adjusted, and on the basis of that I had told him that it would take sometime to dispose of the stuff in order to realize the actual value which we would determine, after suit, or otherwise, and Mr. Franklin told me that if we could dispose of these goods and reduce the value to about ten thousand dollars, then he would adjust it.

"Q. What was said in this conversation in Lafayette on May 22nd between you and Mr. Franklin? Just give us the words. A. At first I went over there to Bob Acres where we made an estimate of this material at Bob Acres, and while we were there we got to discussing there—I was insistent on this claim, because it was heavy, and I wanted to get it settled. * * * I asked him just what he had in mind regarding the disposition of this stuff, and he told me to go ahead and dispose of the stock, and when it was all completed to bring it to him, or send him a bill, and if it was within a reasonable figure he would adjust the matter. That is exactly what he told me. That is exactly what I have done."

Then, under cross-examination:

"Q. Well, anyway the only time you claim he said he was going to pay it was May 22, 1946, and then you waited until June 6, 1947 to bring suit. A. On May 22nd I had a claim of twenty some odd thousand dollars which we had applied for in writing, and then he told us to reduce the claim and make it just as reasonable as possible, and, according to his idea, we did just that, and then we filed our invoice in accordance with the reduction he had requested, and when we did not get a response to

that then we got in touch with him, and that is when he made the final denial. He denied it on May 8th, and it was reinstated in the conversation of May 22, 1946."

At another time, still under cross-examination:

"Q. Now then, tell me, if you please, what you did yourself between January 5th and March 27th to ascertain what damage had occurred? A. I started negotiations for replacing the roof, and getting that damage straightened out, and as we went along we found more roof damage than we knew we had, and we knew we would find more stock damage, and the result was that when we started going through the stock, we began to find more and more cans of stock that was damaged, which resulted in damaged cans, and as we got into the inventory we found more and more of this damage, and I talked to Mr. Franklin about it, and he stated that when we got it all adjusted—we had replaced about seventeen hundred and some odd cases, and we had done our best to get it in shape for movement, and he was aware of that fact, and he came out there, and we had to dispose of the stock because it was damaged, and all of this was going on as we went along."

Then, on final cross-examination, plaintiff testified, as follows:

"Q. Now, when did you reach Ville Platte from Los Angeles? A. May 14th.

"Q. Now, Mr. Ketteringham, you had turned over these salvaging operations to some concern in Los Angeles? A. That is correct.

"Q. What is the name of that concern? A. Boradori Brokerage Company, Los Angeles, California.

"Q. These goods were perishable goods, were they not? A. No, Sir, they were in cans.

"Q. They were not going to deteriorate? A. Yes, from the rusty condition received from the leaky roof caused by the storm. We reworked and tried to keep it from getting any worse, and, according to Mr. Franklin's statement if it had been inspected immediately it would have been all right, except a small damage, which he admitted, but his damage was different to what we found."

Now, to quote from Mr. Franklin's testimony:

"Q. While you and Mr. Ketteringham were in Lafayette together did you have any discussion about the claim involved in this suit? A. No, sir.

"Q. Are you absolutely sure of that? A. Yes, as reasonably sure as I can be.

"Q. Isn't it a fact you did have some discussion about the claim involved in this suit? A. I don't think so. I don't think so.

"Q. But you are not sure? A. To the best of my recollection the matter of this claim did not come up in any manner, shape or form.

"Q. Isn't it a fact that on that occasion in Lafayette Mr. Louis Dupre was also there? A. That is correct, yes.

"Q. He is also a representative of the defendant company, isn't he? A. He is the local agent at Ville Platte, yes.

"Q. Isn't it a fact that on that occasion in Lafayette you told Mr. Ketteringham to go ahead and disposed of that stock of damaged goods involved in this suit and that after the claim was thereby reduced by whatever he received to about one-half you would then make an adjustment with him? A. Definitely not.

"Q. You are absolutely certain about that? A. I am absolutely certain I did not.

"Q. You are sure you did not tell him anything about it? A. As I stated before, I do not recall discussing this claim on that occasion.

"Q. But you are not positive that you did not discuss it? A. I think I have already stated I did not.

"Q. But you did not say that you were positive? A. I am positive it did not come up for discussion.

"Q. Would it not have been entirely natural for you to mention it? It was a pending claim then, was it not? A. I don't think it was up to me to mention it.

"Q. But it was a pending claim between your companies and Mr. Ketteringham then? A. It had been up for discussion prior to that, but at the time of that visit to Lafayette we went to a canning plant near Abbeville, and this claim that is the subject matter of this suit here was not discussed at all."

And again the following quotation as to Mr. Franklin:

"Q. And you had not told him prior to that you would not pay it? A. No, sir.

"Q. So would not it have been entirely natural for one or the other of you to have mentioned it? A. It would not have been natural for me to have mentioned it. It was his claim. It did not come up for discussion.

"Q. After the 22nd of May 1946, is it not a fact that Mr. Ketteringham called at your office in New Orleans a number of times and discussed the matter involved in this suit with you? A. May 22,—

"Q. (Interrupting) After you saw him in Lafayette? A. As I stated, I do not remember the exact date I saw him in Lafayette, so I cannot remember when I saw him on or after May 22nd, because I am not sure.

"Q. Well, after May 22, 1946, isn't it a fact Mr. Ketteringham called at your office a number of times and discussed the matters involved in this present suit? A. If this will answer your question, on the date of May 8th, 1946, I sent Mr. Ketteringham a telegram, addressed to him at The Alexandria Hotel, Los Angeles, California, in reply to a telegram I had received from him, my telegram reading: 'Your telegram you must act on your own responsibility as any liability on the part of interested companies is denied.' That was on the 8th of May, 1946.

"Q. Now, is it not a fact that this meeting between you and Mr. Ketteringham took place in Lafayette subsequent to the time you sent that telegram? A. That I do not recall.

"Q. That you do not recall? A. No, sir.

"Q. Isn't it a fact that after May 8th, 1946, Mr. Ketteringham called at your office and you had a number of other conferences with him about adjusting this claim? A. I don't think we had many discussions after May 8th, no, sir.

"Q. Did you have any? A. That I don't recall. * * *

"Q. Do you remember a telephone conversation you had with Mr. Ketteringham on February 27th, 1947? A. I don't recall that, sir.

"Q. Or about that time? A. I can't recall that.

"Q. I am talking about a long distance telephone conversation? A. To the best of my knowledge I believe Mr. Ketteringham no doubt did call, but there are so many calls coming into my office on long distance I can't remember one that far back, certainly not one before or after a certain date. I can't recall that call.

"Q. What were you talking about on these telephone calls? A. About his claim. He was always talking about this claim.

"Q. One involved in this suit? A. Yes.

"Q. Do you recall having a telephone conversation with him on or about February 27th, 1947, if not on that exact date about that time? A. No, sir, I do not.

"Q. When was the last conversation you had with him on the telephone about this claim here? A. The last I recall, after my telegram of May 8th, upon his return to Ville Platte I believe Mr. Ketteringham—in fact when I talked to him on one date—I don't remember what date it was—at that time he advised me he was having salvage arrangements made for the damaged goods in California.

"Q. You do not remember any other conversation after May 8, 1946, by telephone? A. No, sir.

"Q. Would you say you did not have any with him? A. No, sir.

"Q. Now, isn't it a fact, Mr. Franklin, that on February 27, 1947, you had a long distance telephone conversation with Mr. Ketteringham, the plaintiff, in which this claim involved in this suit was discussed, and in which you stated you had approved the claim, but you could not pay it, because if you did you would admit liability—I mean you stated that you admitted you owed part of the claim, but you could not pay that because if you did you would have to admit liability on the balance of the claim? A. I don't recall telling him that.

"Q. You don't recall having had a conversation with him on or about February 27th, 1947, or somewhere about that time? A. No, sir, I do not."

But Mr. Franklin, at the very end of the trial, answered, on cross-examination, as follows:

"Q. Mr. Franklin, is my understanding correct of your testimony, that you are positive that after May 8th, 1946, when you sent Mr. Ketteringham the telegram on that date, that you have had no further conversation with Mr. Ketteringham at all, either while you were together, or by telephone, or long distance telephone, or telegrams, regarding the claim involved in this suit? A. I do not think I testified to that effect. No doubt I have had. As Mr. Ketteringham has testified, there have been possibly a dozen conversations, not all about this claim, but between us over a long period of time.

"Q. After May 8th, 1946? A. Both before and after.

"Q. Then you all continued to discuss it after May 8th, 1946? A. Discuss it, yes, but no admissions of liability.

"Q. When did you cease the discussion? A. I don't recall, Mr. Loret. May I add this—in my office in New Orleans I do not handle all of the claims the Franklin Adjustment Bureau had, and there are discussions of them in the course of a year's time by many people in the office, and it is perfectly possible for him to have been there, and talked to somebody else in the office one or any number of times, and I might not have known about it.

"Q. I do not want the conversations he had with anybody else, but I want the conversations with you there personally, or when you were present—I mean when both of you were in the same place there, when you were either together, or talked to him about it. You say you did have some conversations about this claim after May 8th, 1946? A. Probably did, yes.

"Q. You don't know? A. I can't recall the date.

"Q. Then you would not be in a position to say when you had the last one, would you? A. I don't believe I would, no, sir.

"Q. Now, I believe you stated that you inspected some of the damaged beans on the dump at Ville Platte? A. Yes.

"Q. Do you recall what date you made that inspection? A. No, I do not exactly, but I believe Mr. Ketteringham stated I was over there on a fire loss for another man and he recalls that date, and I know it was approximately about that time.

"Q. Would you state ·the 3rd, 4th, or 5th of April, 1946? A. I think he has identified it to be about that date, and I would not deny it.

"Q. Well, can you tell us about the date? A. I would say that he was approximately correct on the date. It seems to me that it was about that part of April.

"Q. About how long before that had he notified you of the beans being on the dump? A. I would say probably several days, maybe a week, that I received the notice before that.

"Q. Now, you wrote that letter that we have offered in evidence marked 'P-1' to the Salvage Company on the date it bears, is that correct? A. The letter to the Salvage Company?

"Q. Yes. A. The one marked 'P-1' ?

"Q. Yes. A. Yes.

"Q. It is dated April 29, 1946? A. Yes, sir.

"Q. You wrote that to the Salvage Company on that date? A. Yes.

"Q. You knew at that time the beans had been shipped to California? A. Yes, that is correct.

"Q. About how long before) that date had you learned that they had been shipped to California? A. I think I just answered that question.

"Q. Well, about how long before you wrote that letter to the Salvage Company was it that you learned about the beans having been shipped to California? A. I would say Mr. Ketteringham probably could answer that date better than I could, because as soon as he had knowledge of it I understand he notified his insurance agent who, in turn, notified me.

"Q. That would be Mr. Dupre? A. I assume so, yes, sir. It would be entirely natural for him to do so.

"Q. Rather than to notify you direct? A. Yes."

We believe, for the following practical reasons, after having seen both witnesses testify in person, that Mr. Ketteringham's memory served him the better and we believe what he said and have to disbelieve Mr. Franklin:

a) There was a meeting in Lafayette. It is true that it was in part to settle a small claim of the plaintiff which had occurred at his Abbeville plant, but it was only 14 days since the May 8th telegram sent to Mr. Ketteringham in California. Mr. Ketteringham had come back from California to Ville Platte and then had gone to Lafayette and the salvage of his big shipment of beans in California was actually in progress. His mind was full of this damage, whether in or out of the presence of Mr. Franklin. It is just simply human for him to have mentioned it, and yet Mr. Franklin testifies it was not even mentioned.

b) Mr. Ketteringham's attitude and demeanor show a conciliatory disposition. But, we are convinced that unless Ketteringham received assurance of some reasonable adjustment from Mr. Franklin on May 22nd at Lafayette that Mr. Ketteringham would have waited to file suit so long.

c) Mr. Franklin, after his having so positively stated, upon his being called to the witness chair as under cross-examination, that the claim was not mentioned at all at Lafayette, at the very end of the trial, having then been placed on the stand by the defendant companies and being under cross-examination by plaintiff's counsel, admitted that he might have said something about the claim which Mr. Ketteringham could have construed to mean what Mr. Ketteringham said Mr. Franklin said about the claim.

d) Mr. Dupre, local agent of the defendant companies, was present with Mr. Ketteringham and Mr. Franklin on the trip to Bob Acres in Lafayette, but Mr. Dupre has yet to appear as a witness in this case. Because of his relation to the defendant companies, we must assume, as a matter of law, that if called he would not testify favorably for them.

e). Mr. Franklin admits telephone calls by Mr. Ketteringham to him at his office in

New Orleans after the date of the meeting at Lafayette, May 22nd; he also admits at least two visits to his office by Mr. Ketteringham; of course, again, the two men differ as to the subject of the conversations, but we believe that Mr. Franklin, feeling that Mr. Ketteringham, in truth, was entitled to be paid the damage, was always conciliatory and repeatedly promised an adjustment of around $10,000.00. Ketteringham, if denied payment, would have filed this suit long before he did.

■ Therefore, all in all, in conscience, we believe that Mr. Franklin made the promise as described by Mr. Ketteringham, lulling the plaintiff to inaction.

Now, with the above decided facts before us, we proceed to examine the applicable law.

■ Provisions in insurance policies limiting the time within which suits can be brought on them can be waived by the insurers. Williams v. Life Ins. Co. of Virginia, 3 Orleans App. 34; Turner v. Bankers & Shippers Ins. Co. of New York, La. App., 187 So. 122; Fellman v. Royal Ins. Co. 5 Cir., 184 F. 577, 106 C.C.A. 557, and 5 Cir., 185 F. 689, 107 C.C.A. 637.

In the case of Thompson, Receiver, v. Phenix Ins. Co. of Brooklyn, N. Y., 136 U.S. 287, 10 S.Ct. 1019, 1023, 34 L.Ed. 408, the following language appears: "It remains only to consider the question arising out of that clause of the policy limiting the time within which a suit or action against the company for the recovery of a claim arising out of its provisions may be sustained. While the validity of such a stipulation cannot be disputed (Riddlesbarger v. Insurance Co., 7 Wall. 386, 389 [19 L.Ed. 257]) we do not doubt that it may be waived by the company; and such waiver need not be in writing. It may arise from such a course of conduct upon its part as well equitably estop it from pleading the prescribed limitation in bar of a suit by the insured." See, also, Bergeron v. Mansour, 1 Cir., 152 F.2d 27, 30; Lynchburg Cotton Mill Co. v. Travelers' Insurance Co. of Hartford, Conn., 4 Cir., 149 F. 954, 9 L.R.A.,N.S., 654.

■ Courts do not require very stringent evidence of waiver of limitation periods for bringing actions on insurance policies. Fellman v. Royal Ins. Co., 5 Cir., 184 F. 577, 106 C.C.A. 557.

The physical facts of the case necessarily caused a delay in the definite and exact proof of amount of loss because of the damage not being subject to ready ascertainment. At an early date, the amount claimed orally, by mail, and with a bill submitted on April 27, 1946, was $22,319.56, but quite later, after salvage, the amount sued upon becomes $12,802.86.

■ Accordingly, the plea of prescription of one year, as a part of their answer, filed by the defendants should be overruled and denied.

■ The proponents of the plea of prescription refer us to article 2277 of the Louisiana Civil Code, which provides that the uncorroborated testimony of one witness is insufficient to prove a verbal contract involving more than $500.00. This is not applicable here because there are written contracts previously existing between the parties. See the three policies placed of record. The issue is not to prove a verbal contract involving money at this time; the issue is merely whether or not the plaintiff is lulled into inaction upon the promise or promises of the defendant companies' legally-authorized representatives.

Our conclusion is not at variance with the number of Louisiana cases cited by defendants wherein provisions in the policy limiting the time within which to file suit were enforced. In not one of these cases was there a lulling into inaction by the insurance company. In like manner and for the same reason, we find no objection to the number of federal cases cited by defendants, wherein the same policy provisions were enforced.

Judgment overruling the plea of prescription will be duly signed.